## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **SUSAN WALSH**, <br><br> Plaintiff, <br><br> vs. <br><br> **DONER INTERNATIONAL LIMITED, INC.; DETROIT ROYALTY INCORPORATED; DONER PARTNERS, LLC D/B/A DONER, A LIMITED LIABILITY COMPANY**, <br><br> Defendants. | **2:18-CV-13930-TGB** <br><br><br> **ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO SEAL** |

Plaintiff, a former creative director at an advertising company, alleges Defendants paid her less than her male counterparts because of her sex, in violation of Title VII of the Civil Rights Act of 1964 and the Equal Pay Act, and eventually terminated her because of her age, in violation of the Age Discrimination in Employment Act and Michigan's Elliot-Larsen Civil Rights Act. Because genuine issues of fact must be resolved by a jury on each of Plaintiff's causes of action, Defendants' motion for summary judgment will be denied.

## I.   Background

Plaintiff Susan Walsh, 61, began working for Defendant Doner Partners LLC[1] ("Doner") in 2010.  ECF No. 36, PageID.2273.  Doner is a large advertising agency with corporate clients across many industries nationwide.  ECF No. 30, PageID.1020.  Plaintiff, who began her career in the advertising industry in 1984, was hired by Doner as a senior copywriter, and was subsequently promoted in 2013 to associate creative director and in 2014 to creative director.  ECF No. 36, PageID.2273. Plaintiff remained a creative director until her termination in 2018.  ECF No. 49, PageID.3398.  Plaintiff's creative director salary was $127,625. ECF No. 30, PageID.2021.  During her time at Doner, Plaintiff worked on a team reporting to executive creative director Randy Belcher.  *Id.* at PageID.1021-22.

Belcher's team successfully pitched and ultimately handled a number of Doner's large accounts, including work on advertisements for Fortune 500 companies and large hospital systems.  ECF No. 49, PageID.3398; Belcher Dep., ECF No. 38-1, PageID.2397.  The number of accounts Belcher's team was responsible for at any one point in time waxed and waned over the years, however.  According to Belcher, his team brought in business but was never given new clients from within

---

[1] Donor International Limited, Inc. and Detroit Royalty Incorporated never employed Plaintiff.  Plaintiff has agreed to voluntarily dismiss those two entities.  ECF No. 36, PageID.2286 (fn.23).

2

the company that his team had not initially pitched to. Belcher Dep., ECF No. 38-1, PageID.2400. In 2015, Doner removed two of Belcher's employees and terminated six others from the team as part of a "reduction-in-force." *Id.* at PageID.2401; ECF No. 39-1, PageID.2493. The reduction in force also affected other teams, and in total twenty-one employees were terminated from Doner's creative department, thirteen of whom (62%) were over the age of forty. *Id.* During the same year, Doner hired ten new employees, eight of whom (80%) were under the age of 40. ECF No. 39-2, PageID.2519.

In July 2016, Eric Weisberg was announced as Doner's new global creative chief. ECF No. 36, PageID.2275. In August 2016, Doner implemented another reduction in force, terminating eight employees from the creative department, three of whom (38%) were over the age of forty. ECF No. 39-1, PageID.2496. During the course of 2016, Doner hired nineteen new employees, fourteen of whom (74%) were under the age of forty. ECF No. 39-2, PageID.2519.

In March 2017, Doner terminated six employees as part of a reduction-in-force, four of whom (67%) were over the age of 40. ECF No. 39-1, PageID.2499. The next month, during a walkout in recognition of Equal Pay Day, Doner CEO David Demuth announced Doner had learned from an internal audit that women at Doner were on average paid ten percent less than men. Walsh Dep., ECF No. 37-1, PageID.2331-32. In August 2017, Doner terminated another twelve employees, nine

3

of whom (75%) were older than forty.  ECF No. 39-1, PageID.2507.  From May through December 2017, Doner hired eighteen new employees, seventeen of whom (94%) were under the age of forty.  ECF No. 39, PageID.2519-20.

In January 2018, Doner hired four new employees, three of whom (75%) were under the age of forty.  ECF No. 39-2, PageID.2520.  In May 2018, Doner terminated seven more creative department employees in a reduction-in-force, including Plaintiff.  ECF No. 39-1, PageID.2509.  Of the seven employees terminated, four (57%) were over the age of forty. *Id.*  Doner stated that Plaintiff was selected for termination because of "current and anticipated work; economic considerations; employees' performance and compensation; and current and anticipated skills, knowledge, and abilities needed by employees in the future."  ECF No. 30-18, PageID.2058.  According to Doner, Belcher's team (of which Plaintiff was a member) was bringing in less revenue than other teams and could no longer justify their salaries.  ECF No. 30, PageID.1026.

Plaintiff disputes Defendants' stated reasons for terminating her, however, and claims that the reason Belcher's team was bringing in less revenue than other teams was because Doner had been taking accounts and employees from Belcher's team and distributing them to younger employees on other creative teams.   Walsh Decl. ¶ 10, ECF No. 37-2, PageID.2364.  In support of her claim that Doner was engaged in a practice of terminating older employees in favor of hiring younger ones,

4

Plaintiff cites a spreadsheet created by Weisberg, who was tasked with determining who to terminate.  That spreadsheet included a notation to the effect that if Plaintiff and six other employees (five of whom were over the age of 40) were to be terminated, it would result in "[n]o loss of modern creative muscle." ECF No. 41-1, PageID.2809.  Plaintiff also cites handwritten notes from the meeting at which Weisberg decided to terminate Plaintiff, which state, apparently in reference to Belcher (age 60 and also terminated), "where [business] going [requires] investments in different skills."   ECF No. 41-2, PageID.2828.   In support of her argument that Doner's financial situation was not actually so bad at the time when Doner terminated Plaintiff, Plaintiff cites internal emails from April and May 2018 where Doner management describe the need for "more bodies" to support an overextended creative staff as a result of new business and employee resignations.  ECF No. 41-1, PageID.2801. Plaintiff also cites a May 9, 2018, email in which Weisberg describes the "new business/project work pace . . . taking a toll on creative [employees]" being unsustainable "without an infusion of people." ECF No. 41-1, PageID.2807.  Plaintiff thus suggests that Doner needed more creative staff to be hired, not less, at the time she was terminated.

With regard to Plaintiff's performance during her eight-year tenure at Doner, she was promoted twice and consistently received favorable reviews from her supervisor, Belcher.  Belcher Dep., ECF No. 38-1, PageID.2373; ECF No. 30-8, PageID.1574 (2013 review calling her "a

brilliant mind and a hard worker"). Indeed, in his deposition, Belcher referred to Plaintiff as "among the best writers [he'd] ever worked with." Belcher Dep., ECF No. 38-1, PageID.2373. During Plaintiff's time at Doner, creative directors were paid between $125,125 and $220,000, with a mean of $164,663. ECF No. 42-3, PageID.2923. Plaintiff's salary was $127,625, which was lower than twelve other creative directors, nine of whom were male (it was also lower than the salary of seven lower-ranking male associate creative directors) and higher than only one other creative director. *Id.* at PageID.2929.

In 2018, following an internal audit of Doner's salaries, Weisberg performed a review of all of the employees in the creative department to determine whether any pay adjustments needed to be made. Weisberg came to the conclusion that no pay adjustment was owed to Plaintiff because (despite Plaintiff having been a creative director for three years), According to Weisberg, Plaintiff was "[a]t best . . . performing the duties of an associate creative director, and [Plaintiff] was paid as well or better than other associate creative directors." Weisberg Dep., ECF No. 30-4, PageID.1285.

On September 21, 2018, Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) and was given a right-to-sue letter. Am. Compl. ¶ 5, ECF No. 13, PageID.108.

6

On December 17, 2018, Plaintiff initiated this lawsuit by filing the Complaint (ECF No. 1), which was subsequently amended on March 13, 2019 (ECF No. 13).

## II.   Legal Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## III.   <u>Claims I & II: Age Discrimination in Violation of the Age Discrimination in Employment Act of 1967 and the Elliot-Larsen Civil Rights Act</u>

### a. Contentions

Defendants contend that Plaintiff cannot establish a prima facie case of age discrimination because Plaintiff cannot show that she was terminated because of her age.  ECF No. 30, PageID.1032-33.  Defendants

7

assert that any statistical evidence Plaintiff presents of a pattern or practice of Doner terminating older employees is insufficient to make out a prima facie case, and that even if Plaintiff did make out a prima facie case, Plaintiff was terminated because of legitimate business reasons, including decreasing company and team revenue.  *Id.* at PageID.1035.

Plaintiff alleges that Defendants terminated her because of her age and argues that Doner's hiring and termination data evinces a pattern of terminating older employees when conducting "reductions-in-force" and hiring younger ones in their place.  ECF No. 36, PageID.2289.  As evidence that Doner selected her for termination based on her age, Plaintiff cites Doner's reduction-in-force and hiring data, an internal Doner document where Weisberg noted that if a group of predominantly older employees (including Plaintiff) were terminated, it would result in no loss of "modern creative muscle," public comments from Doner's CEO describing the company's desire to hire younger, digital media savvy employees, and internal emails describing Doner's growing need for creative department employees at the time she was terminated.  *Id.*

### b. Legal Standard

Where, as here, a plaintiff is relying on circumstantial evidence of discrimination, her claims are subject to the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this paradigm, a plaintiff must first establish a prima facie case of discrimination.  If the plaintiff succeeds, the burden of production shifts

to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once the defendant has met this burden, the plaintiff must then prove, by a preponderance of the evidence, that the proffered reason was merely a pretext for discrimination. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004).

To establish a prima facie case under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, a plaintiff must show that "(1) [s]he was a member of the protected class, i.e., 40 years old or older, (2) [s]he suffered an adverse employment action, (3) [s]he was otherwise qualified for the position, and (4) [s]he was replaced by a substantially younger employee, or additional evidence shows that the employer was motivated by age." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (citation omitted). In reduction-in-force cases such as this, the plaintiff can alternatively satisfy the fourth factor by providing "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp.*, 896 F.2d 1457, 1465 (6th Cir. 1990). The ADEA requires a showing "that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

Like Plaintiff's ADEA claim, claims under Michigan's Elliot-Larsen Civil Rights Act are also analyzed using the *McDonnell Douglas*

framework above.  *Howley v. Fed. Express Corp.*, 682 F. App'x 439, 441 (6th Cir. 2017).

### c. Discussion

There does not appear to be any dispute between the parties that Plaintiff (59 years old at the time of her termination) was qualified for her position or that her 2018 termination qualifies as an adverse employment action.  Thus, the first three elements of Plaintiff's prima facie claim have been satisfied.  Defendants' Motion focuses on the fourth element: arguing that Plaintiff cannot establish that she was terminated as a result of age discrimination.

In support of her claim that she was terminated because of her age, Plaintiff cites Doner's historical termination and hiring data, as well as a number of statements made by Doner executives at the time that she was terminated, which Plaintiff argues evince a systematic effort by Doner to replace older employees with younger ones.  ECF No. 36.  In the record are statistics from Doner's 2015-18 hiring and reductions-in-force, which include the ages and positions of the employees terminated and hired.  ECF No. 39-1.  Also in the record is an expert report from Plaintiff's statistics expert, Mr. David A. Macpherson, who examined Doner's 2015-18 termination data and concluded that at 3.41 standard deviations, the higher percentage of employees terminated by Doner over the age of fifty in those statistics is "not likely to [have] occur[ed] by chance alone."  Macpherson Rep., ECF No. 43-4, PageID.3006.  In fact,

Macpherson says that the statistical likelihood that the results were the product of chance is 1 in 5,783. *Id.* Defendants have provided their own expert, Ms. Carole M. Amidon, who comes to the opposite conclusion. ECF No. 30-19. After reviewing Doner's hiring and termination data and the dueling expert reports, the Court finds that Plaintiff has submitted statistical data from which a reasonable jury could find that Plaintiff was terminated because of her age. *See Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1129 (6th Cir. 1998) (finding expert's conclusion that there was a less than 1% chance that job eliminations were not due to age discrimination to be evidence that age played role in termination); *Barnes*, 896 F.2d at 1466 (finding plaintiff established prima facie age discrimination cased based on four-standard-deviation statistical evidence).

That is not all. Also in the record is a spreadsheet created by Weisberg and sent to Doner CEO David DeMuth listing Plaintiff and six other employees—five of whom were over the age of 40—for potential termination noting that those seven employees could be terminated with "[n]o loss of modern creative muscle." ECF No. 41-1, PageID.2809. Plaintiff argues that the phrase "modern creative muscle" euphemistically refers to the age of the employees, since "modern" employees are thought by some in the advertising industry to be those who are younger and grew up with digital and social media. ECF No. 36, PageID.2289. Plaintiff also cites a podcast interview with DeMuth where

11

he describes the changing advertising industry and the difficult choices he must make to "change the type of talent [Doner] recruits," in order to find more employees who "understand and embrace technology." BeyondHighStreet (Sept. 11, 2019), https://beyondhighstreet.podbean.com/e/david-demuth-president-ceo-doner/ (relevant discussion at 2:28-5:35). On a follow-up question, DeMuth responds "yeah, totally" when the interviewer asks whether he believes that recruits in their "early-mid-late 20's" are more likely to have the technological savvy DeMuth stated that he was looking for. *Id.*

Defendants contend that Weisberg's "modern creative muscle" comment "has nothing to do with Plaintiff's age" and that Plaintiff is "mischaracteriz[ing] entirely" DeMuth's interview. ECF No. 45, PageID.3253. Upon review of both the spreadsheet and the podcast, however, the Court concludes that determining their meaning is a factual question that should be decided by the jury. At summary judgment, the Court cannot resolve such questions, rather, a reasonable jury should be able to consider both comments in the context of all of the other evidence and weigh whether they should be interpreted as evidence of an intent to discriminate based on age. Taking the statistical and circumstantial evidence together, a reasonable jury could find that Plaintiff has established a prima facie case of age discrimination.

The analysis next shifts to whether Plaintiff has provided evidence that "the legitimate reasons offered by the defendant were not its true

12

reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Here too, a jury question precludes summary judgment for Defendants. Defendants contend that "[f]atal to [Plaintiff's] claim is the absence of any evidence that revenue reductions did not occur, were not the actual reasons for the RIF, or were insufficient to merit the RIF." ECF No. 30, PageID.1036. On the evidence of record, however, a reasonable jury may not agree. Plaintiff has presented evidence that Defendants were actually looking for "more bodies"—not fewer—as a result of newly acquired business and that Plaintiff in particular was being sought by an understaffed team at the time she was terminated. Walsh Decl. ¶ 10, ECF No. 37-2, PageID.2365; ECF No. 41-2, PageID.2828; ECF No. 41-2, PageID.2801; *see also* ECF No. 41-1, PageID.2807 (May 9, 2018, email in which Weisberg discusses the "toll on creative [employees]" being unsustainable "without an infusion of people."). Moreover, Plaintiff states in her declaration that the losses in revenue experienced by Belcher's team were caused by Doner's decision to take accounts away from them and to reduce their team's size by twenty-six people over a span of three years while never giving the team new accounts. Walsh Decl. ¶¶ 9-10, ECF No. 37-2, PageID.2364; Belcher Dep., ECF No. 38-1, PageID.2400. Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could find that Defendants' stated revenue-loss justification for terminating

Plaintiff was in fact pretextual. Consequently, Defendants are not entitled to summary judgment on Plaintiff's age-discrimination claims.

## IV. Claims III & IV: Sex-Based Discrimination in Violation of the Equal Pay Act and Title VII of the Civil Rights Act of 1964

### a. Contentions

Defendant contends that Plaintiff cannot establish a prima face case of sex discrimination, and that even if she could, Doner can demonstrate that any pay disparities were due to factors other than her sex. ECF No. 30, PageID.1040-42. Defendants further assert that any pay disparities Plaintiff identifies between male and female creative directors "during the period of 2016 and 2018 [are not] statistically significant." *Id.* at PageID.1040.

Plaintiff contends that she has established a prima facie case of sex-based pay discrimination because she has identified ten male creative directors and seven male associate creative directors who were performing the same or similar tasks as she was, but were being paid more than she was. ECF No. 36, PageID.2294-95.

### b. Legal Standard

The Equal Pay Act (EPA) prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work. 29 U.S.C. § 206(d)(1). In order to establish a prima facie case of wage discrimination under the EPA, the plaintiff must

show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"  § 206(d)(1)).

"Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974)).  Because these are affirmative defenses, the defendant bears the burden of proof. *See Corning Glass Works*, 417 U.S. at 197; *see also EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 988 (6th Cir. 1992). The burden shifting under the EPA differs from the Title VII framework, in which a "defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the plaintiff as compared to her similarly situated male co-workers," *Buntin*, 134 F.3d at 799 n.6, at which point the burden shifts back to the plaintiff to show pretext.  Under the EPA, the plaintiff "never bears the burden of persuasion regarding the affirmative defenses." *Id.* at 800 n.7.  The defendant will only be entitled to judgment as a matter of law if it establishes a defense "so clearly that no rational jury could [find] to the contrary." *Buntin*, 134 F.3d at 800

15

(internal quotation marks omitted); *see Kovacevich v. Kent State University*, 224 F.3d 806, 827 (6th Cir. 2000) ("There must be no genuine issue as to whether the difference in pay is due to a factor other than sex.").

The analysis of a claim of unequal pay for equal work "is essentially the same under both the Equal Pay Act and Title VII", *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981);  The only difference being that "[u]nlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.), *cert. denied*, 485 U.S. 930, 108 (1988), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### c. Discussion

In the record is an internal analysis from Doner that found that the average male creative director was paid $174,700 and the average female creative director $156,906.  ECF No. 42-3, PageID.2932.  Doner has publicly admitted as much, announcing on Equal Pay Day, April 4, 2017, that women at Doner make 90% of what men make—a statement that made its way into media reports at the time.  *See* ECF No. 1-2, PageID.35-36.  Doner does not argue that male and female creative directors worked under different conditions or that their jobs required different skill, effort, or responsibility.  Consequently, since "equality of work, not

16

equality of workers, is what matters in establishing a prima facie case under the [EPA]," *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 106 (6th Cir. 2006), a reasonable jury could find that Plaintiff has established a prima facie case under the EPA based on the cited internal pay differential statistics. *See id.* at 107 (plaintiff met burden of establishing prima facie EPA case by showing that average male employee performing same work earned more than average woman).

Since Plaintiff has established a prima facie case under the EPA, Doner is entitled to summary judgment only if it has so clearly established a statutory defense that there is no genuine issue as to whether Plaintiff's lower pay was based, in whole or in part, on her sex. *Id.* In support of her argument that she was paid less because of her sex, Plaintiff identifies three male creative directors who Plaintiff argues were similarly situated and paid more than her, including Steve Bantien, who "worked on the same accounts, had the same duties and responsibilities, yet . . . made approximately $40,000/year more than [Plaintiff]." Walsh Decl. ¶ 5, ECF No. 37-2, PageID.2362.

Defendant argues that Plaintiff was paid less than some of her male counterparts because despite having the same title as other creative directors for more than three years, she was, in fact, not fulfilling the expectations of a creative director and performing duties more akin to that of a lower-paid associate creative director. ECF No. 30, PageID.1040. Specifically, Defendants cite the fact that Plaintiff was

not "directly leading any account or piece of business" like other creative directors.  *Id.*; Weisberg Dep., ECF No. 30-4, PageID.1218.   Defendants argue she was performing duties most comparable to Michael Oxner, a male creative director who was also not "leading any accounts or pieces of business as the outfacing creative at the time" and was being paid less than Plaintiff.  Weisberg Decl. ¶¶ 10-11, ECF No. 30-2, PageID.1050.  Defendants further attempt to distinguish Plaintiff from other creative directors by arguing that the pay differential was justified by the fact that other creative directors were on higher revenue-generating accounts, and with the boilerplate recitation that "Doner considered the following factors in setting employee pay:  the employee's years of service with Doner; the employee's salary history, experience, and education niche or skills that are particularly relevant to the market; the employee's performance; work  responsibilities; market conditions; and the accounts the employee worked on."  Bartha Decl. ¶ 2, ECF No. 30-16, PageID.20532; ECF No. 30, PageID.1042.

Defendants' sex-neutral justification for paying Plaintiff less than other creative directors may well turn out to be valid.  Viewing the facts in the light most favorable to Plaintiff, however, this Court cannot find that Defendants have met their "heavy burden" and "so clearly established a statutory defense that there is no genuine issue as to whether Plaintiff's lower pay was based, in whole or in part, on her sex." *Ambrose*, 172 F. App'x at 107.  To start, Plaintiff distinguishes herself

from Michael Oxner, whom Defendants assert was similarly situated to Plaintiff for salary purposes, by the fact that Oxner arrived at Doner four years after Plaintiff, was less experienced, and did not have a master's degree. Walsh Decl. ¶ 6, ECF No. 37-2, PageID.2362.

Second, as discussed in the preceding section, an issue of fact exists as to whether Belcher's team was bringing in less revenue than other teams because Doner management was redistributing the team's accounts and employees to other teams in a long-term effort to dismantle Belcher's team before terminating its older members—including Plaintiff and Belcher—in reductions-in-force. Were Plaintiff to prove such facts, a jury could find Defendants' proffered revenue-based justification for Plaintiff's lower salary unpersuasive.

Third, Defendants assert that Plaintiff's allegedly poorer performance was a basis for her lower salary, but that position is contradicted by evidence in the record that Plaintiff was considered by her supervisor, Belcher, to be a high-performing employee. ECF No. 38-1, PageID.2373; ECF No. 30-8, PageID.1574. Defendants do identify Plaintiff as having not been the point-person on any one client account—in contrast to her higher-paid peers—but it is not clear from the record how long before Plaintiff's termination Defendants made that assessment, and whether it contributed to her low pay before Doner's wage audit and subsequent wage adjustment decisions. In other words, it is not clear whether Plaintiff's failure to be the point-person on any one

particular account could have been the reason she was paid less in the years leading up to the 2017 audit, or whether it was merely the reason her pay was not adjusted upward after the 2017 and 2018 wage adjustments. A "post-event justification" cannot save a defendant from a claim of "unequal pay for equal work." *Odomes*, 653 F.2d at 252. Finally, Plaintiff has identified a number of other male creative directors whom Plaintiff asserts were similarly situated to her but higher paid, such as Steve Bantien, who Defendants have not specifically addressed in their briefing. Given these questions of fact, the Court cannot conclude that Defendants have conclusively proven that Plaintiff's lower pay was not based on sex. These questions are properly left for the jury.

With respect to Plaintiff's Title VII claim, the Sixth Circuit has held that "when an [EPA] claim and a Title VII claim arise out of the same set of underlying facts, both stating a charge of wage discrimination, 'the standards of liability under the two statutes are sufficiently similar' that the disposition with respect to the two claims should be the same." *Clark v. Johnson & Higgins*, 181 F.3d 100, slip op. at *3 (6th Cir. 1999) (unpublished table decision) (quoting *Korte v. Diemer*, 909 F.2d 954, 957 (6th Cir. 1990)). Accordingly, analyzing "a claim of unequal pay for equal work is essentially the same under both the [EPA] and Title VII," and "[a] finding of 'sex discrimination in compensation' under one Act is tantamount to a finding of 'pay discrimination on the basis of sex' under the other." *Korte*, 909 F.2d at 957-59 (citation and internal quotation

marks omitted); *see also* 29 C.F.R. § 1620.27(a) ("any violation of the [EPA] is also a violation of Title VII"). Consequently, "'where the plaintiff defeats the defendant's motion for [summary judgment] with respect to her EPA claim by raising a genuine issue as to the defendant's reason for the differential pay, she also defeats [its] motion for [summary judgment] brought against her parallel Title VII claim.'" *Beck-Wilson v. Principi*, 441 F.3d 353, 369 (6th Cir. 2006) (alterations in original) (quoting *Buntin*, 134 F.3d at 801).

Accordingly, Defendants are not entitled to summary judgment on either Plaintiff's EPA or Title VII claims.

## V.   Waiver of Jury Trial

Defendants devote the last two sentences of their summary judgment motion to the claim that Plaintiff waived her right to a jury trial in her employment contract with Doner, and then make no mention of it in their reply.  ECF No. 30, PageID.1044.  Plaintiff responds in the last footnote of the opposition that there was no mutuality and thus the jury trial waiver is unenforceable.  Plaintiff does not explain why there was no mutuality.

The question of whether or not this case shall proceed before a jury or as a bench trial is an important one that cannot be resolved at this point based on the parties' scant briefing.  Consequently, within thirty (30) days of the date of this Order, in no more than ten pages, the parties

shall provide additional briefing to the Court on the question of whether or not Plaintiff has waived her right to a jury trial.

## VI.   Motion to Seal (ECF No. 44)

Defendants move to seal a number of depositions (exhibits A,C,E,L,M and Q) filed by Plaintiff in connection with her opposition to Defendants' motion for summary judgment.  ECF No. 44.  Defendants contend that the exhibits "contain confidential and proprietary information covered under the parties' Stipulated Protective Order" as well as birthdays of Plaintiff and two non-party individuals.  *Id.*

Plaintiff argues that Defendants have failed to meet their burden because they have not described in sufficient detail how the disclosure of the exhibits at issue would cause harm to Doner or its clients.  ECF No. 47.

There is a strong presumption of openness to court records.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  "[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."  *Id.*  "Sealing court records . . . is a drastic step, and only the most compelling reasons should ever justify non-disclosure of judicial records."  *In re Perrigo Co.*, 128 F.3d 430, 446 (6th Cir. 1997) (Moore, J., concurring in part).  Indeed, courts in this district have held that "in order to have confidential information in a court record kept under seal, the movant must make a specific showing that disclosure of information would result in some sort of serious

competitive or financial harm." *Tinman v. Blue Cross & Blue Shield of Michigan*, 176 F. Supp. 2d 743, 745 (E.D. Mich. 2001).

Here, Defendants seek to redact the name of clients from hundreds of pages of depositions in this matter with the assertion that a failure to redact would result in the disclosure of "the habits of certain Doner customers, their spending patterns, their needs for business, and other information Doner has invested significant time in acquiring." ECF No. 44, PageID.3231. That kind of blanket, boilerplate assertion falls short of the Sixth Circuit's mandate that "[t]he proponent of sealing . . . must analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305–06 (6th Cir. 2016) (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002)). Moreover, the public interest in keeping client names in the record in this case is not insignificant, as one of Plaintiff's principal arguments is that specific accounts were moved by Doner from her team to other teams before her termination, and that younger, less experienced employees were given those same accounts before and after she was terminated. Were the names of the clients to be redacted from the depositions, it would be difficult for the public to follow Plaintiff's arguments, and in turn, the record that the Court ruled on in this case. Defendants' motion to seal will be denied to the extent that it seeks a blanket redaction of all client names.

With respect to the birthdates of non-party individuals, there is no discernable public value in maintaining that information in the record. Defendants' motion to seal is granted to the extent that it seeks to have the birthdates in the named depositions redacted.

## VII. Conclusion

For the reasons set out above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**. Defendant's Motion is **GRANTED** in that Defendants Donor International Limited, Inc. and Detroit Royalty Incorporated are dismissed from this action. Defendants' Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal (ECF No. 44) is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's exhibits A (ECF No. 37-1), M (ECF No. 42-1) and Q (ECF No. 43) are **STRICKEN**. Plaintiff is **HEREBY ORDERED** to file copies of exhibits A, M and Q with birthdates redacted.

**SO ORDERED**.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

24